## Tackett v. Commonwealth.

(Decided April 26, 1929.)

CAUDILL & TACKETT and W. W. WILLIAMS for appellant.

J. W. CAMMACK, Attorney General, and SAMUEL B. KIRBY, JR., Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

In the afternoon of Sunday, September 16, 1928, appellant, Henry Tackett, who was 39 years of age, killed his cousin, Bob Jones, who was 20 years of age, by cutting and stabbing him with a knife. The homicide occurred in the road in front of the residence of George Tackett, an uncle of appellant, on Frasure creek in Floyd county. At the following term of the Floyd circuit court, appellant was indicted and charged with murder. At his

314

trial thereunder he was convicted of voluntary manslaughter and punished by confinement in the penitentiary for a period of 21 years. Complaining of the verdict and judgment, he prosecutes this appeal, and his counsel in their brief urge a number of reasons as grounds for reversal, all of which we have concluded are immaterial and without merit and which we will attempt to briefly point out.

■ It is strenuously insisted that the verdict is unsupported by the evidence and is flagrantly against it. Defendant does not deny killing the deceased in the manner charged in the indictment, but claims that he was compelled to do so under his right of self-defense. If the killing had been done *immediately* at the *time* and the *place* of the *beginning* of the difficulty resulting in the death of Jones, there would be greater support for that argument; but the preponderance of the testimony as given by the eyewitnesses, plus a number of circumstances in the case, furnish abundant support for the conclusion that later, and at the *time* and *place* of the fatal stab, the deceased had abandoned the difficulty, although he may have wrongfully precipitated it at the beginning and that defendant was then in no danger of injury, death, or bodily harm at the hands of the deceased, and consequently cannot shield himself under his right of self-defense.

To follow the witnesses and recite anything approaching a detailed statement of the testimony heard at the trial would, not only make this opinion unreasonably long, but would also be of no service to anyone. In substance, and briefly, it was shown at the trial that the deceased, his brother, King Jones, and two or three others started out on the morning of the fatal day in a promiscuous wandering up and down Frasure creek, and some of its tributaries, with the primary purpose of supplying themselves with intoxicating liquor, in which they to some extent succeeded. In their meanderings they met with others at different places and at times the original crowd would become separated for a while, but they would again assemble at another point, and in the meantime decedent had acquired a guitar and while resting from the labors of their pursuit he entertained them, and others in hearing distances, with the strains of his music on that instrument. No one appeared to be angry and all were having what they must have concluded was a

general good time. Decedent's stepfather-in-law, George Tackett, who as said was also an uncle of appellant, lived in the neighborhood, either upon Frasure creek or one of its tributaries, and about 3 o'clock p. m. on that day the members of the original crowd, except King Jones, appeared at the home of George Tackett where the same good feeling appears to have prevailed, and deceased entertained the members of the household and the assembled crowd by continuing to play his guitar, while seated on the ground in the yard.

Within a short while King Jones, who had become separated from the others, appeared at George Tackett's home and had a short private conversation with his brother, the deceased. Just before arriving at that place, King Jones and Arthur Osborne had appeared at the home of appellant some distance away, either down or up the same creek, but as to which we are unable to state from the record. The five persons who were then at appellant's house were himself, King Jones, Arthur Osborne, appellant's wife, and a sister-in-law whose name was Virgie Newsome. Some time prior to the fatal day the deceased had lost some chickens, and he either suspicioned or accused appellant of having taken them, and the charge seems to have gained circulation in the neighborhood. In his similar travels on that day, Arthur Osborne, according to the evidence for the commonwealth, had conversed with some one about that same charge concerning his brother-in-law, the appellant. While he and King Jones were at appellant's house, the former mentioned the matter, and appellant, as Jones testified, became enraged and breathed threats against deceased, and remarked: "I will go up there (the residence of George Tackett where deceased was) and cut his damned head off." Whereupon his wife and his sister-in-law attempted to dissuade him from doing so. Defendant and some of his witnesses denied making any such threat, but it was testified to by King Jones and is supported by some of the circumstances in the case. The latter suggested that they go in search of some apple brandy to be found at a place known by him, and defendant testified that he finally but reluctantly agreed to go.

On their way they passed the house of Epp Henderson, when appellant and Osborne engaged him in a short conversation and during which the brandy and liquor were, at least, mentioned. In the meantime King Jones

went ahead and arrived at the residence of George Tackett some few minutes before the arrival of defendant and Osborne, and it was during that brief time that the private conversation was had between deceased and his brother, King Jones. When defendant arrived at that place, those present were engaged as hereinbefore stated, but his arrival seems to have created consternation on the part of some of the members of the crowd, especially George Tackett, his wife, and Mrs. Bob Jones, who was the daughter of Mrs. Tackett by a former husband. The head of the household, George Tackett, immediately demanded that every one should get out of the yard, and Mrs. Bob Jones accused appellant with the intention and purpose of producing trouble, when he replied that he had not come for "trouble out of George but the God-damned bunch." Whereupon Mrs. George Tackett exclaimed: "Lord have mercy children what is the matter!" and immediately went back into the house and fainted. About that time Bob Jones started for the gate just outside of which appellant was located and drew a pistol and fired it at appellant but missed him; but whether he either drew or fired his pistol before appellant drew his knife is in conflict, the evidence preponderating, however, that he did so before the knife was drawn. A general fight then ensued, during which appellant was cutting and gashing the body of deceased, principally on the head and back, the two being clinched; but decedent soon ceased efforts at firing his pistol and released himself and started to run with defendant in pursuit, and when reaching a point, according to the testimony of several witnesses for the commonwealth, 173 feet from where the fight started, appellant overtook him and stabbed him in the heart, which, under the proof, was the fatal blow, the wound being large enough for one of the witnesses to insert his finger up to his knuckles. The deceased immediately fell and expired, and appellant walked away towards his home with the former's pistol that he had in some manner gotten possession of during the fight.

The testimony of appellant and his witnesses is to the effect that deceased continued in his efforts to fire his pistol (which was empty, except one shell that was first fired) until and at the time of the fatal blow, and which occurred not more than 10 feet from where the fight first

began and which if true would at least furnish some grounds for the argument that the defense relied on was established by the evidence, or the contrary verdict was flagrantly against it. If, however, the jury believed, and which it had the right to do, the testimony of the witnesses for the commonwealth, then the killing was entirely inexcusable and the relied on defense was not available. The circumstances, to some extent at least, sustained the testimony of the commonwealth's witnesses. The extent to which the body of decedent was gashed and carved showed that the work was not that of a reluctant hand exercised only in its possessor's self-defense. It displayed a condition of butchery bordering onto savagery. However, none of the wounds, according to the proof, was sufficient to produce death, or at least so quickly, except the last and fatal stab in the heart, which, as we have seen, according to commonwealth's witnesses, was inflicted after deceased had abandoned the difficulty and was endeavoring to escape. The same witnesses also said that after such abandonment deceased would look back at his pursuer and express friendship for him and pleaded with him to desist from his angry pursuit.

The case is of course, like many of similar ones, in that it contains many contradictions in the testimony, but there was sufficient proof to support the verdict upon the theory that the killing occurred as depicted by the commonwealth's witnesses in their testimony, and under uniform rulings of this court we are without authority to disturb the verdict upon the grounds that it was without evidence for its support, or that it was flagrantly against the evidence.

■ It is next insisted that the court admitted incompetent testimony which mainly consists of that relating to the stolen chickens, and cases are cited dealing with the relevancy of proof of other crimes. But, clearly, this argument is without merit, since under the rule denying proof of independent crimes generally there is the conspicuous exception that it is competent to do so when the proven crime tends to furnish a motive for the one on trial. The proof about the chickens in this case related to the proven threats of appellant against deceased made at his house a short while before the killing, and while en route therefrom to the home of George Tackett where the killing occurred, and appellant was induced to make them

from the reports brought to him by his brother-in-law, Arthur Osborne. That current charge, whether true or false, was evidently the source of bad feeling existing between the two combatants, and the complained of testimony was competent to prove that fact. No effort was made on the trial to prove the truth of the charge, but the *fact* of the charge was the relevant one, and the court did not err in admitting the testimony to the extent it did.

Under this head some remarks and exclamations of the parties present immediately at the time appellant appeared at the home of George Tackett are complained of. In the first place, they all might be regarded as immaterial even if erroneous. They were mostly made, however, in the presence of appellant, and those that were not so made were repetitions of others to the same effect that were made in his presence and to which he responded. Moreover, such testimony, though both erroneous and material, could have no bearing on the difficulty except the cause of its beginning and could not possibly affect what transpired *at the time* of the fatal stabbing after decedent had abandoned the difficulty although he and not defendant was responsible for its beginning. If the complained of testimony was concededly erroneous and material and related to matters occurring *at the time* of the fatal stabbing, for which appellant is accountable under the testimony of the commonwealth, then a different question might be presented; but, as it does not so relate, it is our conclusion that all of it, if improperly admitted, did not imperil appellant's substantial rights under the facts as they existed at the immediate time of the infliction of the fatal wound.

It is furthermore insisted in support of this argument, that the court erroneously admitted the introduction of the clothing that deceased was wearing at the time, because the garments were not properly identified as the ones then worn by him. The testimony on that point was furnished by decedent's widow, and she identified them as his clothing and that they were in the same condition as when they were "taken off," and had been preserved by her in that condition since his death. We think there can be no other reasonable conclusion or inference to be drawn from that testimony than that they were the same garments worn by him at the time he was killed. Besides, appellant admits the infliction upon the body of deceased of every wound that it bore, and the

introduction of the clothing was but confirmatory of the number and location of the numerous wounds that he did so inflict. He did not dispute or deny the location of any of them, and, even if the clothing was erroneously introduced, it would not be prejudicial to defendant's rights under the testimony adduced. Complaint is made of some other minor items of testimony possessing less merit than the ones we have discussed, and upon the whole we find nothing in the record to sustain this argument.

■ It is next argued that the court erred in its instructions, and failed to give to the jury the whole law of the case, and in brief of counsel it is said in support thereof that: "We ask the court to read all of the instructions, as our impression is that the instructions as a whole do not give the jury a right to consider what the defendant believed at the time, more so as to what the jury might believe." Evidently that criticism is directed to the self-defense instruction, which we have carefully examined and can truthfully state that it conforms to the self-defense instruction in criminal cases approved in many opinions of this court. Indeed, we find no room for improvement upon it, and counsel is clearly in error in assuming that it did not give appellant the right to act upon his own reasonable belief in exercising his right of self-defense. There is also complaint made hereunder that the court did not admonish the jury concerning certain evidence, but we have carefully read the record, and we find nothing therein to sustain it.

■ It is next argued that counsel for the prosecution was guilty of misconduct in his argument to the jury, and what purports to be such remarks is set forth in the motion for a new trial, but all of which are not contained in the bill of exceptions; and under an unbroken line of our opinions we are permitted to consider only the latter, i. e., those contained in the bill of exceptions. One of the remarks so brought to us was a reference to the stolen chickens, which we have seen it was competent to prove, and, that being true, it was competent for the attorney to refer to it in his argument as constituting the cause of appellant's anger toward deceased and as his motive for killing him after becoming engaged in the difficulty. Another statement contained in the bill of exceptions is one giving the comments by counsel in his argument upon the condition of the clothing that deceased wore at

320

the time he was killed, but which we have hereinbefore said it was competent to introduce. When introduced the garments became evidence in the cause and a proper subject for comment and discussion by counsel. We therefore conclude that there is no merit in this argument.

■ Lastly, it is argued that the court erred in overruling the demurrer filed to the indictment, but which, following brief of counsel, we will not discuss at any length, since all that the brief says, in support thereof, after stating the grounds relied on for reversal, is: "In our argument in this case, we will take them up as they appear, the first (which we have postponed until the last) being a demurrer to the indictment, and in this connection we will only ask the court to read and consider the indictment." We have complied with counsel's request and have concluded that the indictment is about as perfect as could be drawn, based upon the facts testified to by prosecuting witnesses, and submitted by the court's instructions.

Upon the whole case we fail to find any error prejudicial to appellant's substantial rights, and the judgment is affirmed.