## Long v. Commonwealth.

(Decided Feb. 14, 1936.)

O. B. BERTRAM for appellant.

B. M. VINCENT, Attorney General, and R. E. FUNK, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

A short time before midnight on October 22, 1934, the appellant and defendant below, Sam Long, shot and killed Olden Wesley, which occurred at the latter's residence in Jamestown, Ky., the county seat of Russell county. The two lived but a short distance apart on the same street but on opposite sides thereof. The weapon was a double-barreled shotgun, but only one barrel was discharged. Appellant, to whom we shall hereafter refer as defendant, was later indicted by the grand jury of that county charged with murder, and at his trial thereof he was found guilty of voluntary manslaughter and punished by confinement in the penitentiary for five years. His motion for a new trial was overruled, and, from the verdict and judgment pronounced thereon, he prosecutes this appeal. The only grounds for reversal presented and argued in this court through brief of counsel are: (1) The admission of incompetent evidence offered by the commonwealth and objected to by defendant; and (2) the rejection of competent evidence offered by the defendant, to which he, by his counsel, objected. Other grounds are stated in the motion, but, under the prevailing rule adopted by this and other reviewing courts, they will be considered as abandoned if not relied on in brief filed on appeal. We have nevertheless closely considered the record as to the grounds so abandoned and find none of them to possess merit, even if they could be consid-

ered errors at all, which is extremely doubtful. We will therefore confine our opinion to the two grounds that counsel has chosen to discuss in his brief, and dispose of them in the order named; but, before doing so, a synopsis of the facts as disclosed by the evidence will be made.

Deceased lived on Tin street, in Jamestown, Ky., and defendant's residence was some 75 or 100 yards distant on its opposide side. Earlier on the fatal evening, defendant, who owned an automobile, with his wife and several others, including decedent, went to some sort of party or gathering at the home of Will Hardwick, some three miles distant from Jamestown. Between 10:30 and 11 o'clock p. m. the party was interrupted by a more or less general fight which started between defendant and Hardwick. During its progress, defendant produced a pistol with which he was striking Hardwick and probably intended shooting it, when Jesse Canada and the deceased took it away from him and gave it to a woman whose name the record does not disclose. During the armistice that followed, defendant, with the same crowd, returned to Jamestown, stopping first at his residence. The others, besides Mr. and Mrs. Long soon left and went to the residence of the deceased. Defendant claims that before their departure from his residence he suggested returning to the scene of battle at the Hardwick residence, and that deceased agreed to accompany him. He is not substantiated as to the time and place of his making that suggestion or as to the agreement of the deceased therewith, although the testimony is more or less convincing that the suggestion was made and the deceased did so agree before leaving defendant's residence or shortly thereafter. Before decedent and the others left defendant's residence after their return from the gathering at the Hardwick home there was some disturbance amongst the members of the Long family; there being some children besides Mr. and Mrs. Long. Immediately following their departure from defendant's home, more or less loud conversation was heard by the surrounding neighbors and in which Mrs. Long was heard to say to her husband: "Sam, don't do that." The Long children were crying, and it and other outcries evidenced that some unusual disturbance was hap-

pening in the Long home. Witnesses also heard Long ask his wife something about his pistol, of which he had been deprived by decedent and Canada in the manner and at the time above stated. Clearly from that testimony and some additional facts proven in the case defendant was considerably angered at being deprived of his pistol and because the person who did it had not returned it to him.

Some few minutes thereafter Long emerged from his residence with a double-barreled shotgun, and his oldest child, a girl, followed him crying, but he commanded her to return to his home, but which she did not obey. He started immediately in the direction of the Wesley residence, upon the porch of which sat the deceased and a Mr. and Mrs. Lowhorn, who were members of the automobile crowd attending the Hardwick party, and who went and returned from there in defendant's car. Mrs. Wesley, who testified that she was standing in the partly opened door of her residence, said that defendant with his gun approached within twenty feet or less of the Wesley residence when he addressed the deceased and asked him, "Where is my gun?" that deceased started to answer him but he spoke only the word "Sam," when the latter raised the gun and fired the load which took effect in his bowels and severely punctured them, from the effects of which he died about forty-eight hours thereafter in a hospital in Danville, Ky. The witness testified that deceased was sitting on the porch with his feet swinging off its edge when he was shot, and that immediately after inflicting the wound defendant returned to his home, but soon came back without his gun, and what he did then is thus stated by her: "Well, he tried to get Olden Wesley to say that he didn't shoot him. He put his arms around Olden's neck and said 'I didn't shoot you, I am your friend' when deceased answered and said 'I can't say that Sam, you shot me.'"

Other witnesses present verify that testimony, but added that deceased also said: "You have killed me." Defendant's account of how the shooting occurred is thus stated by him: "We had been down to the country to a music party, come back home, had a little trouble down there, I was fixing to go back, I asked Olden to go with me, and he said Sam, I would go with you anywhere. He said, I have got a banjo in the car, go-

ing to take it out, he went out there and got the banjo, taken it on home, I suppose, did not see it any more. I got the gun out and some shells. I came out, he lives across the street a little farther down from where I live. I walked across over there, he was standing on the porch, he and Mr. and Mrs. Lowhorn, and one of my little girls the oldest one, I still had not loaded the gun, I said to the little girl, I said sister you had better run on back home. I said Lowhorn, I am going back down there or something like that, he and his wife sitting up here, and Olden Wesley sitting down here, Olden got up and said 'Sam, I will go with you.' I was loading the gun, after I broke the gun down, holds two shells, after I broke the gun down, I put the bolt down and Olden got up and stepped out a little and the gun went off, as I put the last shell down."

Upon cross-examination he admitted the fight which he and Hardwick started at the latter's residence and also that he concluded to take along his gun upon his contemplated return thereto for fear he "might again get into trouble." On cross-examination he was pressed so hard for explanations of his conduct that in a number of instances he declined to answer the questions propounded to him and, according to the record, sat mute. Those questions were, of course, directed towards eliciting the truth of his story, and had for their purpose to and actually did disprove its credibility. No one can read the record with an impartial mind and come to any other conclusion than that defendant was angered upon his return from the Hardwick party, and especially toward those who had deprived him of his pistol, one of whom was deceased, and which accounts for his inquiry directed toward deceased immediately preceding the shooting, "Where is my gun?" Also no impartial mind can reach any other conclusion than that the disturbance at the Long residence after the return from the Hardwick party and the following of defendant by his little girl when he started to the Wesley residence grew out of what the family knew was his determination to do some one harm with the gun, most probably Wesley, who had assisted in depriving him of his pistol. Hence the proven exclamation by Mrs. Long, "Sam don't do that." At any rate the jury were abundantly authorized by the proof to so conclude.

Besides, the account given by defendant of the shooting as inserted above is both hazy and incredible and bears the earmarks of a makeshift to escape the consequences of an unenviable dilemma. Of course defendant and his witnesses contradict some of the salient facts proved by those who testified for the commonwealth, but such contradictions, after the cross-examination, largely faded away. But without such weakening thereof, the question at least was one for the jury, and it believed the testimony given by the commonwealth's witnesses and which we are not authorized to disturb under the invariable rule of practice prevailing in this and other appellate courts on review of a jury's verdict.

■ Turning now to the argued grounds supra, counsel argue in support of ground 1 (a) that the court erred in allowing Mrs. Wesley to introduce the clothing worn by deceased at the time he was shot, and in support of that proposition he cites two cases from the state of Missouri which we have not consulted, because we have dealt with the question so often that we would not be authorized to depart from our rule howsoever the question might be determined by foreign jurisdictions. In the circumstances of some cases we have held that it was error to introduce the clothing of deceased or a person who was wounded, but the facts in those cases were such as to make the introduction of such testimony prejudicial to the rights of defendant. We need not state those facts or the rules which led to such conclusions, since in this case they clearly do not appear. There was some dispute in the testimony as to the position of deceased at the time he was shot. Moreover, the defendant admitted the shooting, but claimed that it was unentential and accidental. The exhibition of the clothing to the jury could not in any remote way affect the question of defendant's criminal or innocent intention in firing his gun, and which was the only issue in the case. It may be that, except for some light it might throw on the position of the deceased at the time he was shot, the clothing had no bearing on the issue under investigation, but, if true, it likewise was clearly nonprejudicial to defendant's rights. See Blankenship v. Commonwealth, 210 Ky. 413, 276 S. W. 112; Tackett v. Commonwealth, 229 Ky. 312, 17 S. W. (2d) 241 (a case exactly in point); Belch-

er v. Commonwealth, 245 Ky. 125, 53 S. W. (2d) 214, and Gross v. Commonwealth, 255 Ky. 88, 72 S. W. (2d) 1017.

In support of the same ground counsel also argues (b) that the dying declaration of deceased was erroneously admitted because when given by him he did not consider himself in the throes of impending death. It was testified to by his father and was made by deceased about thirty minutes before he died. The wound inflicted on deceased was evidently a mortal one, which the physicians and others immediately recognized, not so much on account of its location, but the many punctures of his bowels made by the shots in the load that entered his body causing his entrails to protrude and lie on the floor in their punctured condition as an immediate result of the wound. In the conversation containing the dying declaration, as testified to by the father, deceased stated that he knew he was going to die, and that "He asked me to take care of his children and raise them as I had raised him, that he would not be here very much longer." The father then asked him about the shooting, and the answer of the deceased, as given by the witnesses, was: "He said Sam Long shot him, he said he shot him with a shot gun, that he (Long) came walking over there, spoke a few words and just shot him." No argument is needed to justify the court's ruling in admitting that declaration or in refutation of the argued grounds for its exclusion made by counsel. There could scarcely be developed more competent grounds for the admission of the declaration under the well-established rules for the purpose. We therefore conclude that neither of the argued reasons (a) or (b) for sustaining ground 1 is available for that purpose, and they are denied.

■ To sustain ground 2, counsel argues that the court erred in rejecting offered testimony by defendant to prove (c) that deceased, after being shot and after it was concluded to take him to the hospital at Danville, requested defendant to go along with him. The only purpose of that testimony might be to show that deceased, at the time of the shooting or at the time of making the offered suggestion, entertained no malice toward defendant, although that conclusion is a more or less remotely drawn one. If, however, his feelings toward the defendant were as the question and avow-

al sought to indicate, then we are unable to see wherein defendant was prejudiced by not proving it, since it would tend to render the shooting on the part of defendant less excusable because his victim was not angry towards him. But, whatever might be the conclusions to be drawn from such fact, it is clear that it had no elucidating effect upon any issue involved. In support of the same ground, counsel also argue (d) that the court erred in rejecting offered testimony by defendant while on the stand, and which consisted in not allowing him to state that decedent told him some twenty minutes after the shooting that "I know you did not do it intentionally, that it was purely an accident." The avowal as so outlined was denied by every witness who was present at the time, and there were quite a number of them. Moreover, it was not offered as a dying declaration and was not made under circumstances existing at that time admitting it as such. It is not even sought to be supported upon the ground that it was a dying declaration. Neither can it be admitted under the res gestæ doctrine, since it occurred a considerable time after the shooting and after defendant had gone to his home and returned to the Wesley residence, to say nothing about the "conclusion" nature of the offered statement.

Our appraisement of the record unerringly leads to the conviction that defendant was angered at the deceased for having taken his pistol away from him in the Hardwick residence and not returning it to him, and that before that anger assuaged he sought revenge and inflicted the fatal wound to, perhaps, his best friend, as he claimed. His punishment as inflicted by the jury was and is greatly less than that prescribed for willful murder, and which is no doubt attributed to the fact that the jury concluded that the deed was committed by defendant under sudden heat and passion, and but little more than the minimum punishment prescribed for voluntary manslaughter was given. No substantial reason appears why such merciful consideration by the jury should not be upheld; the reasons advanced therefor being wholly inadequate for that purpose.

Wherefore, for the reasons stated, the judgment is affirmed.